UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------- X
JAMES R. MANGELS,

                                  Plaintiff,

                  -against-

NEW YORK CITY, NEW YORK CITY FIRE DEPARTMENT,
LAURA KAVANAGH, in her official and individual capacity,
UNIFORMED FIREFIGHTERS ASSOCIATION OF
GREATER NEW YORK, and JOHN DOES #1-10 (fictitiously
named), in their official and individual capacities,

                                Defendants.
------------------------------------------------------------------------------- X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

       Plaintiff, JAMES R. MANGELS (hereinafter, "MANGELS" and/or "Plaintiff"), by and through his attorneys, THE RUSSELL FRIEDMAN LAW GROUP, LLP, complaining of Defendants, NEW YORK CITY, NEW YORK CITY FIRE DEPARTMENT, LAURA KAVANAGH, in her official and individual capacity, UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK, and JOHN DOES #1-10 (fictitiously named), in their official and individual capacities (hereinafter, collectively "CITY Defendants"), respectfully alleges as follows:

<u>**NATURE OF THE ACTION**</u>

      1.    The instant action seeks declaratory relief to protect Plaintiff's Constitutional rights to due process and property rights pursuant to the Fourteenth Amendment. Plaintiff further seeks monetary damages against Defendants NEW YORK CITY, NEW YORK CITY FIRE DEPARTMENT, LAURA KAVANAGH, in her official and individual capacity, UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK, and JOHN DOES #1-10 (fictitiously named), in their official and individual capacities pursuant to 42 USC § 1983 for

violation of Plaintiff's Constitutional rights to due process and property rights guaranteed under the Fourteenth Amendment.

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is proper under 42 U.S.C. § 1983, 42 U.S.C. § 12101, and 28 U.S.C. §§ 1331 and 1343.

3.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) on the basis that it is the judicial district in the State in which Plaintiff resides. Plaintiff resides within the County of Nassau in the Eastern District of New York.

## PARTIES

4.      At all times relevant, Plaintiff JAMES MANGELS ("MANGELS") was and is a citizen of the United States who resides in Nassau County, State of New York.

5.      At all relevant times described herein, Defendant NEW YORK CITY ("CITY") was and continues to be a municipal corporation organized and existing by virtue of the laws of the State of New York.

6.      At all times relevant, Defendant NEW YORK CITY FIRE DEPARTMENT ("FDNY") is a subdivision and/or agency of CITY and has an office at 9 Metrotech Center, Brooklyn, New York 11201.

7.      At all times relevant, upon information and belief, Defendant LAURA KAVANAGH was and is an employee of Defendants CITY and FDNY with the title of Acting Commissioner and is being sued in her individual and official capacity.

8.      At all times relevant, upon information and belief, Defendant UNIFORMED FIREFIGHTERS ASSOCIATION OF GREATER NEW YORK ("UFA") was and is a labor

origination with its principal place of business located at 204 East 23rd Street, New York, New York 10010.

9.      At all times relevant, upon information and belief, Defendant JOHN DOES #1-10 (fictitiously named) ("DOES") are unknown persons who have directly participated in, have knowledge of, and have had personal involvement in the deprivation of Plaintiff's Constitutional rights, and are being sued in their individual and official capacities.

## ADMINISTRATIVE AND PROCEDURAL HISTORY

10.      Plaintiff timely filed a charge of employment discrimination against Defendants with the U.S. Equal Employment Opportunity Commission (hereinafter, "EEOC") on February 9, 2022; EEOC Charge No. 16G-2022-01351.

11.      Plaintiff received a Notice of Right to Sue from the EEOC, dated September 29, 2022, concerning the charges of discrimination herein.  A copy of the Notice is annexed hereto as **Exhibit "A"**.

12.      Plaintiff's Complaint is filed within ninety (90) days of receipt of said Notice of Right to Sue.

## STATEMENT OF FACTS

13.      Plaintiff MANGELS is a 52-year-old male. MANGELS is a 9/11 responder and, at all relevant times to the instant Complaint, had been employed as a firefighter with Defendants CITY and FDNY.

14.      MANGELS had been a firefighter since January of 2002 until his forced retirement and wrongful termination in February 2022. MANGELS began his career working at Engine 6, the Tammany Hall Tigers, a house whose members had been decimated by the attacks on 9/11.

15.     In July of 2008, MANGELS transferred and began working at Engine 268, the Beach House, at Rockaway, Queens. MANGELS continued to work at Engine 268 through to his forced retirement and wrongful termination in February 2022.

**Relevant Factual Background**

16.     Well over two years ago, on March 12, 2020, Bill DeBlasio, then mayor of NYC, declared a state of emergency for CITY following the first confirmed case of COVID-19.

17.     In the ensuing months, COVID-19 killed thousands of New Yorkers. Despite the many uncertainties surrounding COVID-19, MANGELS as well as many of his fellow firefighters never ceased working on the front lines to keep CITY and its residents safe.

18.     The men and women of FDNY, throughout the pandemic, continued to perform essential public safety work despite the challenges of COVID-19. Of the 15,670 FDNY responders [firefighters and EMS] 5,175 had a confirmed or suspected diagnosis of COVID-19.

19.     By the winter of 2020/2021, COVID-19 vaccines became publicly available, and were readily available to those eligible to receive the vaccine.

20.     At least 85% of adults in New York City had received at least one dose of the vaccine by the fall of 2021, prior to CITY's vaccine mandate.

21.     However, relevant to the instant case and CITY's vaccine mandate, existing vaccines do not prevent infections or transmissions, and they are of waning effectiveness.

22.     Moreover, the superiority of natural immunity to vaccination is now recognized, even by the CDC. On January 28, 2022, the CDC concluded, based on a study of data from New York and California, that recovery from a prior COVID-19 infection provides superior protection than vaccination: namely, natural immunity is 2.8 times as effective in preventing hospitalization and 3.3 to 4.7 times as effective in preventing infection compared with vaccination.

23.     New York State's declaration of emergency with respect to COVID-19 expired on June 24, 2021. New York State lifted its mask-or-vaccine requirement for businesses and other indoor spaces (except for K-12 schools) as of February 10, 2022.

24.     On August 31, 2021, Executive Order No. 78 was issued, which established a mandatory vaccination or weekly test requirement for all CITY employees ("Vax or Test").

25.     FDNY members complied with the Vax or Test policy for weeks without issue.

26.     The Vax or Test was an effective means of striking the appropriate balance between encouraging vaccination and respecting the medical autonomy of FDNY members.

27.     On October 20, 2021, two months after the Vax or Test policy, the New York City Commissioner of Health issued an order requiring all CITY employees to obtain a COVID-19 vaccine ("Vaccine Mandate Order"). **Exhibit "B"**.

28.     The Vaccine Mandate Update, dated October 21, 2021, required all CITY employees to provide proof of vaccination no later than October 29, 2021. **Exhibit "C"**.

29.     The sole provision in the Vaccine Mandate for non-compliance was that unvaccinated employees must be excluded from the premises at which they work beginning on November 1, 2021. **Exhibit "B"**, ¶3.

30.     In the evening of October 21, 2021, NYC Department of Citywide Administrative Services released guidance, in the form of a "FAQs" document, which set forth additional rules relating to the Vaccine Mandate. **Exhibit "D"**.

31.     In addition to establishing woefully inadequate procedures relating to medical exemption and/or accommodation requests (while predetermining that "accommodations will only be granted in limited circumstances," Id. ¶21), the guidance provided as "the penalty for non-compliance" that: "[b]eginning November 1, [CITY] staff who are not in compliance with the

vaccine mandate and have not applied for a reasonable accommodation will be placed on Leave Without Pay (LWOP)," and "[e]mployees who refuse to comply will be terminated in accordance with procedures required by the Civil Service Law or applicable collective bargaining agreement." Id. ¶51.

32. Prior to the Termination Requirement, Defendants did not terminate any FDNY member for non-compliance with the Vaccine Mandate. Nor did Defendants commence any processes to attempt to do so "in accordance with procedures required by the Civil Service Law or applicable collective bargaining agreement."

33. Pursuant to the Taylor Law, Defendant CITY was required to bargain with its unions the impact of the Vaccine Mandate Order.

34. UFA did not reach a negotiated settlement with CITY regarding the impact of the Vaccine Mandate on their members.

35. In point of fact, UFA properly challenged the Vaccine Mandate in numerous venues, including New York State Supreme Court and before the Public Employment Relations Board.

36. Purportedly, as part of CITY's implementation of the Vaccine Mandate, CITY supposedly offered FDNY members who have either a medical or religious reason for not taking a vaccine an opportunity to seek a reasonable accommodation to exempt the employee from the Vaccine Mandate.

37. Apart from the fact that these procedures were ill-communicated, on information and belief, out of all the accommodations submitted by FDNY members none were granted.

**Plaintiff James Mangels**

38.     Prior to October 29, 2021, MANGELS sought guidance and assistance in regard to the Vaccine Mandate from his superior officers as well as from FDNY administration. Specifically, MANGELS sought information regarding medical exemptions and/or reasonable accommodation from the Vaccine Mandate.

39.     MANGELS was provided with no guidance and/or communications with regards to the implementation of the Vaccine Mandate. Superior officers, similarly, provided no information or guidance as to how the Vaccine Mandate would be implemented.

40.     MANGELS worked seven (7) twenty-four-hour tours from October 20, 2021, through October 26, 2021, except for one occasion when he worked from 1800 until 0900.

41.     At the commencement of each of these tours, members would discuss issues of importance regarding the job. While individual members questioned the validity of such a mandate, at no point was information provided to FDNY members regarding the implementation of the Vaccine Mandate.

42.     MANGELS was provided with no information or lawful options with regards to the implementation of the Vaccine Mandate. MANGELS was simply directed to contact FDNY Bureau of Health Services ("BHS").

43.     On October 25, 2021, MANGELS began exhibiting COVID like symptoms at the end of his tour. MANGELS would later test positive for COVID-19.

44.     On October 27, 2021, MANGELS was contacted by the FDNY BHS and advised that he had tested positive for COVID. MANGELS was placed on medical leave until November 10, 2021.

45.     On November 4, 2021, MANGELS called BHS seeking information regarding the Vaccine Mandate in view of the fact that he had now contracted COVID. There was no response at BHS. MANGELS then called and spoke with his Captain. He advised his Captain that he was unable to reach anyone at BHS. MANGELS was advised to keep trying to reach BHS.

46.     On November 5, 2021, MANGELS was advised by a nurse at BHS that BHS' authority regarding the Vaccine Mandate had been suspended and BHS could not extend his medical leave.

47.     On November 9, 2021, MANGELS contacted his primary physician to schedule an appointment. That same day, at approximately 2:45 p.m., MANGELS was seen by his primary physician. MANGELS' primary physician conducted a physical examination. At this time, MANGELS continued to feel the effects of COVID.

48.     On November 10, 2021, MANGELS sought to get guidance and information regarding the Vaccine Mandate and extended medical leave from BHS. He spoke with the lieutenant on duty at BHS but was unable to obtain any guidance or information.

49.     On November 11, 2021, MANGELS called BHS and was unable to speak to anyone as no one answered the phone.

50.     On November 12, 2021, MANGELS called his firehouse and spoke to his Lieutenant and informed him of his attempts to speak with someone at BHS.

51.     On November 13, 2021, MANGELS again attempted to visit BHS to seek information and guidance.

52.     On November 16, 2021, MANGELS followed up with his primary physician, Dr. Lauren Kelly. Dr. Kelly conducted an EKG and found irregularities with the EKG. Dr. Kelly

informed MANGELS that he needs to schedule an appointment with a cardiologist. She further recommended that MANGELS not obtain the vaccine.

53.     On November 17, 2021, MANGELS again returned to BHS. BHS placed MANGELS on full duty and was told to report to his firehouse on November 19th.

54.     MANGELS, on November 17, 2021, spoke to a Dr. Leo of BHS who placed MANGELS on full duty. MANGELS advised Dr. Leo of Dr. Kelly's findings and recommendations and asked questions about the Vaccine Mandate. No information was forthcoming from BHS. Dr. Leo's response was that he "could not make a determination on the vaccine."

55.     MANGELS returned to full duty on November 19, 2021 to begin his tour. At 10:30 a.m., MANGELS was relieved of his duty due to not being vaccinated and placed on leave without pay ("LWOP").

56.     On November 22, 2021, MANGELS again went to his primary physician. Dr. Kelly confirmed the EKG findings. Thus, due to MANGELS' history of IBS and this newly found irregularity in his EKG, Dr. Kelly advised against vaccination.

57.     On November 25, 2021, MANGELS requested and was allowed to go on medical leave.

58.     On November 27, 2021, MANGELS went to BHS to inquire about an exemption and/or reasonable accommodation to the Vaccine Mandate. MANGELS spoke to a Dr. Kakolous and was told to go upstairs and speak with Office of Equal Employment Opportunity ("EEO") and request a medical exemption from them.

59.     At EEO, MANGELS was informed that he could not be there in person and that he must complete and submit the application online.

60.     MANGELS was unable to either locate and or complete the "online" process FDNY and/or CITY implemented in order to request a medical exemption and/or reasonable accommodation for the Vaccine Mandate.

61.     On November 28, 2021, MANGELS submitted the only medical exemption/reasonable accommodation form he could identify online to FDNY. MANGELS' medical exemption/reasonable accommodation request was submitted together with a letter from his treating physician indicating that MANGELS had been directed not to get the COVID-19 vaccine until clearance from his cardiologist due to a newly found cardio condition. MANGELS submitted his request via email.

62.     On November 29, 2021, MANGELS reached out to his union delegate and inquired about his options regarding the Vaccine Mandate. MANGELS was informed that he either obtains the vaccine or he will continue to be on LWOP and thereafter face termination and lose his pension.

63.     Throughout, MANGELS, and for that matter all members of FDNY, were provided with no guidance and/or information regarding the Vaccine Mandate thrusted on FDNY members by Defendant CITY.

64.     CITY's mandate was unlawful, violative of Plaintiff's rights, and served no legitimate purpose. It has been proven that the impact of vaccination on community transmission of circulating variants was not significantly different from the impact among unvaccinated people.[1]

65.     Nonetheless, members of FDNY, such as MANGELS, were given an ultimatum to either get the COVID vaccine or be placed on LWOP and thereafter face termination.

---

[1] https://www.thelancet.com/action/showPdf?pii=S1473-3099%2821%2900768-4;
https://www.medrxiv.org/content/10.1101/2021.09.28.21264260v2.full

66.     These mandates came after FDNY had fostered mistrust with its members. After the 9/11 attack on New York City, the CITY, FDNY, and their administration, along with the federal government, assured their members that the air quality at ground zero and the "pile" was safe to conduct search and rescue operations. Nothing could have been further from the truth.

67.     The years following the CITY, FDNY, and their administrations' declaration that the air at ground zero was safe, 306 active and retired FDNY members have died of 9/11 related cancers, respiratory, and gastrointestinal issues.[2] Soon, the number of members that have died of 9/11 related issues will surpass the 343 members that died on 9/11.

68.     Subsequent 9/11 litigation has revealed a tale of wholly ineffective efforts to protect FDNY members with confused and contradictory polices that failed to ensure safety during search and rescue operations conducted at ground zero.

69.     As a 9/11 responder, MANGELS knew and was well aware of Defendants' history of failing to protect its members and providing misinformation, in particular when dealing with mass casualty incidents. Rather, MANGELS decided he would rely on his training and the available information regarding COVID, its transmission and susceptibility.

70.     In this backdrop, MANGELS was faced with an impossible decision – vaccinate and possibly exacerbate his existing cardio condition and IBS or be terminated from the job he dedicated a majority of his adult life to.

71.     The financial consequences of being terminated from FDNY and losing two decades of dedicated service left MANGELS with no other choice but to retire.

---

[2] https://www.nydailynews.com/new-york/nyc-crime/ny-wtc-ground-zero-sept-11-illness-numbers-to-set-milestone-20221003-nbdmkr4defagvajfn7qgfogsu4-story.html

72.     Plaintiff MANGELS submitted his application for retirement on December 5, 2021. However, because Defendants had placed MANGELS on leave without pay, MANGELS had to "buyback" his time in order to reach the 20-year mark. MANGELS was not only forced to retire but had to expend over $10,000 in order to buyback his time.

73.     Preparing for retirement, the application process and submission of paperwork for retirement would normally take no less than 3-6 months for a member. MANGELS was forced to complete this process and make decisions regarding his financial future in a matter of weeks or otherwise face termination and lose the entirety of his two decades of service, pension, and benefits.

74.     On January 31, 2022, without any prior notice to Plaintiff and/or other FDNY members, CITY, through DCAS, issued a Memorandum, dated January 29, 2022, which directed all CITY agencies to ensure that its employees come into compliance with the Vaccine Mandate. The memo further directed that those employees "who fail to submit proof of being fully vaccinated by February 11 will be terminated" (the "Termination Requirement").

75.     The Termination Requirement did not cite any authority for the imposition of this termination penalty. It merely referenced the Vaccine Mandate. However, the Vaccine Mandate made no mention of termination.

76.     This Termination Requirement did not provide for any procedural protections, such as charges or a hearing, prior to termination. This was in complete contradiction to what was stated in the Guidance that any termination would be "in accordance with procedures required by the Civil Service Law or applicable collective bargaining agreement." **Exhibit "D" ¶51**.

77.     The Termination Requirement states that some unvaccinated employees will be permitted to remain employed through June 30, 2022. This reflects the fact that certain unions

representing CITY employees reached settlement agreements with CITY regarding the Vaccine Mandate in exchange for withdrawing their legal challenges.

78.     CITY's press release relating to these settlements stated that: "As part of this agreement, these unions have agreed to withdraw litigation filed last month which challenged the City's right to implement the mandate." The press release further indicated that these settling unions all received the same terms from CITY. In other words, these were not real negotiations at all; CITY foisted terms upon these unions under the coercive pressure of the Vaccine Mandate.

79.     FDNY members are not among those employees that reached "settlements" with CITY. While unvaccinated employees of unions that settled are permitted to remain employed at least through June 30, 2022, the Termination Requirement provides that other unvaccinated employees are subject to immediate termination. Yet, CITY does not claim that the settling employees are somehow differently situated from the non-settling employees from a public health standpoint.

80.     After the Termination Requirement was issued, FDNY began sending form termination notices to unvaccinated FDNY members on LWOP.

81.     MANGELS' forced retirement date was February 13, 2022.

82.     Incredulously, on or about February 14, 2022, FDNY first responded to MANGELS' request for a medical exemption and/or reasonable accommodation request which had been submitted on November 28, 2021. FDNY's response was that MANGELS submitted the application on the wrong form and requested additional information from MANGELS' primary physician.

83.     Then on March 11, 2022, CITY's EEO office transmitted to MANGELS a letter advising him that his request for an exemption/accommodation was administratively being closed.

84.     MANGELS' Constitutional rights have been trampled on by Defendants. MANGELS was afforded no process. Moreover, Defendants' implementation and enforcement of the Vaccine Mandate was in violation of Plaintiff's Constitutional rights.

85.     Defendants' constructive termination of MANGELS was motivated by unlawful discrimination based on disability, and because of Plaintiff's filing of a protected complaint.

86.     Further, Defendants' actions were willful and/or malicious.

87.     As a direct and proximate consequence of Defendants' unlawful conduct as described above, Plaintiff has suffered and continues to suffer loss of income, loss of future income and benefits, and other forms of compensation, including but not limited to, past and future salary increases and other emoluments of employment, emotional distress, pain and suffering, mental anguish, and other non-pecuniary losses.

## AS AND FOR A FIRST CAUSE OF ACTION
*42 U.S.C. § 1983 Violation of Fourteenth Amendment*

88.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

89.     Defendants subjected Plaintiff to the forgoing acts and omissions without due process of law in violation of 42 USC § 1983 thereby depriving Plaintiff of his rights and privileges and immunities secured by the Fourteenth Amendment of the U.S. Constitution.

90.     Defendants, through their actions, violated Plaintiff's due process rights guaranteed to Plaintiff by statute, NYC Administrative Code § 15-113, under the Fourteenth Amendment of the U.S. Constitution.

91.     Plaintiff was not provided the opportunity for a hearing prior to being deprived of his Constitutionally protected property interest.

92.     Defendants were barred by statute and/or contract from suspending Plaintiff without pay without due process.

93.     Plaintiff, as a public employee, who may only be discharged for cause, has a Constitutionally protected property interest in his job, and could not be suspended without pay without due process.

94.     Defendants have denied Plaintiff due process of law by not providing a hearing before an impartial hearing officer resulting in a wrongful, and unlawful leave of absence, and a termination of a Constitutionally protected liberty or property interest.

95.     Defendants, acting under color of law, and through their employees, servants, agents, and designees, have engaged in a course of action and behavior rising to the level of a policy, custom, and condoned practice, which has deprived Plaintiff of his rights, privileges, and immunities secured by the Constitution and law in violation of 42 USC § 1983. These actions were condoned, adopted, and fostered by policy makers including but not limited to KAVANAGH and DOES.

96.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer irreparable harm, loss of income, loss of other employment benefits, injury to reputation and good name, damage to tier family status, being subjected to scandalous claims and investigations, and has suffered and continues to suffer distress, humiliation, great expense, embarrassment, familial distress, and damages to his reputation.

97.     As a result of Defendants' actions, Plaintiff has suffered and continues to suffer loss of income, loss of future income and benefits, and other forms of compensation, including but

not limited to, past and future salary increases and other emoluments of employment, emotional distress, pain and suffering, mental anguish, and other non-pecuniary losses, caused to incur attorney's fees, associated legal expenses, and other special damages, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees and punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### *Discrimination in Violation of the*
### *Americans with Disabilities Act*

98.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

99.     Defendants violated the Americans with Disabilities Act of 1990 (Pub. L. 101-336 (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

100.     Title 42 of the Americans with Disabilities Act of 1990, Chapter 126, Subchapter I, Section 12112, Discrimination [Section 102] states: No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

101.     At all times relevant to this action, Plaintiff was and is an "otherwise qualified individual with a disability" within the meaning of the Rehabilitation Act and the regulations promulgated thereunder by virtue of Plaintiff's cardio condition.

102.    At all times relevant to this action, Defendants CITY and FDNY were recipients of federal funds within the meaning of the Rehabilitation Act and had 15 or more employees.

103.    As a result of Defendants' actions, Plaintiff has suffered and continues to suffer loss of income, loss of future income and benefits, and other forms of compensation, including but not limited to, past and future salary increases and other emoluments of employment, emotional distress, pain and suffering, mental anguish, and other non-pecuniary losses, caused to incur attorney's fees, associated legal expenses, and other special damages, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees and punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
*Retaliation in Violation of the*
*Americans with Disabilities Act*

104.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

105.    The ADA prohibits retaliation, interference, coercion, or intimidation against an employee who engages in protected activity.

106.    42 U.S.C. § 12203 provides:

Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

107.   As a result of Defendants' actions, Plaintiff has suffered and continues to suffer loss of income, loss of future income and benefits, and other forms of compensation, including but not limited to, past and future salary increases and other emoluments of employment, emotional distress, pain and suffering, mental anguish, and other non-pecuniary losses, caused to incur attorney's fees, associated legal expenses, and other special damages, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees and punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### *Equal Protection 42 U.S.C. § 1983*

108.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

109.   That at all times herein mentioned, Defendants, in their capacities as municipal officials, were acting under the color of State Law.

110.   Upon information and belief, Plaintiff was treated differently than non-disabled individuals.

111.   Defendants denied Plaintiff's accommodation solely or in part based on Plaintiff's disability.

112.   Defendants harassed Plaintiff solely or in part based on Plaintiff's disability.

113.   Defendants constructively terminated Plaintiff solely or in part based on Plaintiff's disability.

114.   All of the actions by Defendants in regard to Plaintiff were performed with malice.

115.   Defendants acted with discriminatory purpose.

116.    As a proximate result of Defendants' intentional and malicious actions, Plaintiff has suffered and continues to suffer loss of income, loss of future income and benefits, and other forms of compensation, including but not limited to, past and future salary increases and other emoluments of employment, emotional distress, pain and suffering, mental anguish, and other non-pecuniary losses, caused to incur attorney's fees, associated legal expenses, and other special damages, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees and punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### *Monell 42 U.S.C. § 1983*

117.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

118.    That Defendant CITY is a "person" within the meaning of 42 U.S.C. § 1983.

119.    That at all times material to this complaint, Defendant CITY, acting through its fire department FDNY, had in effect de facto policies, practices, customs, and usages that were a direct and proximate cause of the unconstitutional conduct of the Individual Defendants.

120.    That Defendant CITY is well aware of the foregoing facts and has received innumerable complaints of disability discrimination, but Defendant CITY has condoned such conduct, and has failed to take sufficiently reasonable actions to investigate and institute polices to prevent or deter FDNY from discriminating against disabled individuals.

121.    That Defendant CITY has condoned unlawful discrimination by its employees and has failed to implement policies and adequately train its employees with respect to the proper constitutional standard for accommodating a disabled individual.

122.    All the aforementioned acts were without any fault on the part of Plaintiff and Plaintiff has been damaged as a result of such conduct.

123.    Under the theory that, by creating, maintaining, enforcing, and/or applying the unconstitutional policy described herein, CITY is liable to Plaintiff under *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978) for the violations of the Constitutional Rights detailed herein, 42 U.S.C. § 1983.

124.    As a proximate result of Defendants' intentional and malicious actions, Plaintiff has suffered and continues to suffer loss of income, loss of future income and benefits, and other forms of compensation, including but not limited to, past and future salary increases and other emoluments of employment, emotional distress, pain and suffering, mental anguish, and other non-pecuniary losses, caused to incur attorney's fees, associated legal expenses, and other special damages, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees.

**AS AND FOR A SIXTH CAUSE OF ACTION**
*Wrongful Termination*

125.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

126.    Plaintiff has suffered damages as a direct and proximate result of the wrongful termination of Plaintiff and, as result of the acts and omissions complained of above here, continues to suffer psychological trauma and mental anguish, and will continue to suffer trauma and anguish for a considerable time to come.

127.    The above complaints are a result of the foregoing, Plaintiff has been damaged in the sum of an amount that exceeds the jurisdictional limits of all law or courts that would otherwise have jurisdiction, the full amount of which is impossible to quantify at this time.

128.    Such conduct by Defendants has damaged Plaintiff in a substantial amount, including but not limited to personal hardship and economic loss in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees.

### AS AND FOR A SEVENTH CAUSE OF ACTION
*Intentional Infliction of Emotional Distress*

129.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

130.    Defendants' acts, practices, and policies described herein were outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

131.    As a direct and proximate consequence of Defendants' intentional conduct as described above, Plaintiff has suffered loss of income, loss of future income and other forms of compensation, including but not limited to, past and future salary increases and other emoluments of employment, severe emotional distress and suffering, mental anguish, and other non-pecuniary losses, all to Plaintiff's damage in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
*Negligent Infliction of Emotional Distress*

132.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

133.    Defendants' acts, practices, and policies described herein were outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

134.    As a direct and proximate consequence of Defendants' negligent conduct as described above, Plaintiff has suffered loss of income, loss of future income and other forms of compensation, including but not limited to, past and future salary increases and other emoluments of employment, severe emotional distress and suffering, mental anguish, and other non-pecuniary losses, all to Plaintiff's damage in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees.

## AS AND FOR A NINTH CAUSE OF ACTION
*Breach of Contract*

135.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

136.    Plaintiff has suffered damages as a direct and proximate result of Defendants' breach of their contractual obligations to Plaintiff and the unlawful acts and omissions complained of above herein and continues to suffer economic loss, to suffer psychological trauma, and mental anguish, and will continue to suffer trauma and anguish for a considerable time to come.

137.    That, as a result of the forgoing, Plaintiff has been damaged in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees.

## AS AND FOR A TENTH CAUSE OF ACTION
### *Request for Declaratory Relief*

138.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in those paragraphs of the Complaint marked and numbered previously and/or herein with the same force and effect as if more fully set forth at length below.

139.    There is a ripe, justiciable controversy between the parties as to the validity and enforceability of the Vaccine Mandate, Guidance, and Termination Requirement.

140.    For reasons set forth herein, which are incorporated by reference herein, the Vaccine Mandate, Guidance, and/or Termination Requirement are invalid because they are violative of the U.S. Constitution and conflict with laws of the State of New York and Administrative Code of the City of New York, vesting the Fire Commissioner with exclusive authority over the governance, administration, and discipline of FDNY members.

141.    Additionally, for the reasons set forth herein, which are incorporated by reference herein, the Vaccine Mandate, Guidance, and/or Termination Requirement are invalid because they exceed the limits on Defendants' enforcement for Health Commissioner orders.

142.    Further, for the reasons set forth herein, which are incorporated by reference herein, the Vaccine Mandate, Guidance, and/or Termination Requirement have been promulgated and/or maintained in violation of rulemaking requirements, including CAPA § 1043 and/or CSL § 20.

143.    Accordingly, the Court should issue a declaratory judgment declaring that the Vaccine Mandate, Guidance, and/or Termination Requirement exceed Defendants' authority

and/or violate the U.S. Constitution, laws of the State of New York and Administrative Code, and are invalid.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff JAMES R. MANGELS respectfully requests judgment against Defendants as follows:

A.      Under the First Cause of Action, in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus punitive damages and attorney's fees;

B.      Under the Second Cause of Action, in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus punitive damages and attorney's fees;

C.      Under the Third Cause of Action in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus punitive damages and attorney's fees;

D.      Under the Fourth Cause of Action in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus punitive damages and attorney's fees;

E.      Under the Fifth Cause of Action in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus attorney's fees;

F.      Under the Sixth Cause of Action in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus attorney's fees;

G.      Under the Seventh Cause of Action in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus attorney's fees;

H.      Under the Eighth Cause of Action in the amount of ONE MILLION DOLLARS ($1,000,000.00) plus attorney's fees;

I.       Under the Ninth Cause of Action in the amount of ONE MILLION DOLLARS

($1,000,000.00) plus attorney's fees;

J.       Under the Tenth Cause of Action for declaratory relief;

K.       For compensatory damages (including but not limited to back pay, front pay, and

emotional distress damages) in an amount to be determined at trial but in no event

less than ONE MILLION DOLLARS ($1,000,000.00);

L.       For all pre-judgment interest and post-judgment interest available under law;

M.       For the costs and disbursements of the within action; and

N.       Such other and further relief as the Court deems necessary, just, and proper.

Dated: Garden City, New York
       November 10, 2022

Respectfully Submitted,
**THE RUSSELL FRIEDMAN LAW GROUP, LLP**
*Attorneys for Plaintiff*

By:      /s/*Pablo A. Fernandez*
         Pablo A. Fernandez, Esq.
         400 Garden City Plaza, Suite 500
         Garden City, New York 11530
         Tel: 516.355.9696
         Email: pfernandez@rfriedmanlaw.com